The next case on for argument is the last case on the docket. Association of Car Wash versus City of New York. Good morning, your honors. May it please the court. My name is Ingrid Gustafson, appearing on behalf of the city. The district court erred in striking down any portion of this law on machinist preemption grounds. The district court misconstrued the plain language of the statute. It misconstrued the scope of machinist preemption. And it relied on improper materials in making a determination about legislative intent. But I'd like to start with the law's plain terms because I think this is the crux of the issue. The surety bond provision here. That's where we start anyway, right? Absolutely. That is the focus of the preemption inquiry. The plain terms of the surety bond demonstrate that far from being a penalty on any employer, let alone a non-unionized employer, it is a protective measure for workers, the city, and the public. What this provision does as a whole, its focus is to ensure that there are sufficient funds available to satisfy wage claims. It creates a baseline standard. In its specific operation, what it does is it creates a baseline that every car wash must obtain a $150,000 surety bond in large part to ensure that there are sufficient funds available to pay the substantial back pay obligations that members of this industry have repeatedly accrued. It then reduces it in two circumstances. Not just one, the presence of the union. In two circumstances where there are alternate enforcement mechanisms in place that are targeted to meeting the goal of the $150,000 surety bond requirement. Those are where there is a collective bargaining agreement providing for the timely payment of wages and an expeditious process for resolving wage disputes and an independent monitoring agreement establishing similar terms. When we look at that statute as a whole, again, we see this provision as a whole. It is not a penalty. It is a protective provision, and it does not turn on the lack or presence of a union. And once we understand those terms, we see why machinist preemption does not apply to the one subdivision that is at issue here. This law, I think it's undisputed, does not regulate the mechanics of the collective bargaining process. It also doesn't regulate the mechanics of self-organization. Instead, what it does is like the minimum labor standards that have been repeatedly approved by the circuit courts and implicitly approved by the Supreme Court with opt-outs, it sets a baseline standard that it allows the parties to contract out of when there are targeted mechanisms in place to satisfy the legislature's initial concerns. Those alternatives are the ones that you just recited at the beginning. That is correct. There are alternatives. One's a CBA, so that means there's a union, right? Yes, but with the additional... Setting aside that one, then the second one, explain this independent monitoring. There is an independent monitoring agreement that has been entered into through a settlement with a state or federal regulatory agency, Department of Labor, Attorney General, both the state and federal level. They're the ones who have carried out enforcement actions in this area and who do... Yes, and who do enter into these types of independent monitoring agreement. Both of those provisions, I must caution that it is not merely the presence of a CBA. It is a CBA setting forth specific requirements, timely payment of wages, expeditious process for resolving wage disputes that are targeted to allaying the concerns of the underlying minimum labor standard. Do minimum labor standards with opt-outs affect the background employment law against which bargaining occurs? Yes. That is the argument that they've changed the incentives, that they could in the application impose additional costs. That has been the argument that has been made about every minimum labor standard with an opt-out, but has been almost universally rejected by the courts because it's too attenuated from the processes that the Act seeks to protect. So here, the claims of pressure, the claims of change in incentives, they fail as a matter of law because they don't matter to the machinist preemption, and they also fail as a matter of fact. They're unproven and implausible. They're unproven and implausible because this is happening at the pleading stage, right? So one question I had is assume we largely wind up agreeing with you that this was a hasty judgment. What happens then? Do we reverse or do we remand and say, well, maybe there should be some discovery into just how coercive this bond is? They say it's a very large bond and a very large disparity between the opt-out, as you call it. I'm not sure that's exactly what it is, a bond and the standard bond. But as is pointed out, they don't make any allegations. They don't have any evidence that talks about what the finances of people in this industry are, what the overall costs might be. I assume that most employers don't want a union for a whole host of reasons, and that they would expect that would increase their costs by a lot, and maybe this is only a little. Well, we say all these things, but aren't they all speculative? Wouldn't it be useful to find out what the facts actually are against the possibility that the bond differential is in some way coercive? This Court does not need to remand. But Your Honor is correct. The district court here granted a summary judgment motion by the plaintiffs that was entirely unwarranted and premature. The alleged costs were speculative and unproven. They were rebutted by the results that plaintiffs claim, that is, that there is some pressure here for a union, are rebutted by the experience of California, which has a similar car wash worker law. That experience shows that provisions like these, $150,000 surety bond, do not, not only not inexorably lead to unionization, but don't even commonly do so. Ninety-nine percent of registered car washes in California don't have this, are not members to a CBA. But this Court can grant judgment as a matter of law for two reasons. One, even if we assume, which is implausible and unproven, that the modest costs of this bond, I mean, we at least agree, plaintiff's own expert's testimony was that the difference in cost. Now, again, the face value is, yes, $120,000, is modest, is $1,200 to $3,600. That's their own expert. So even if we assume that that's more than the cost of unionization, which is implausible and highly unlikely, this Court can still grant judgment as a matter of law because this claim that that would therefore change the incentives of the employer is not one that warrants machinist preemption. As this Court has, as, as. Suppose, suppose the city said we're going to impose an extra $3,600 tax on any car wash that doesn't unionize. Now, that would be a very different statute than this, but it would be a similarly modest penalty. But that would clearly be preempted by the NLRA, wouldn't it? In this, this particular context about background employment law, the State's police powers, there is extensive precedent in this area. And what the Supreme Court has said is that Federal labor law is interstitial to background State employment law. It only preempts State laws that frustrate the purposes of the National Labor Relations Act, which are to protect the processes of self-organization and collective bargaining. And when you have a law like this one that sets a baseline substantive requirement, protective requirement for workers, courts have repeatedly said, yes, that has the potential to affect your incentives during collective bargaining. It shifts the background. If there is an opt-out, maybe it would change, change your incentives. But that is simply too attenuated from the collective bargaining process to warrant preemption. This Court can decide this issue as a matter of law now, even, even accepting plaintiffs' allegations about costs, which, again, are unproven and implausible, and at the very least, you know, remand for further explanation would be warranted. Based on attenuation. We can, we can enter judgment or we can affirm judgment as a matter of law based on your argument that you just gave us. Yes. The effect is too attenuated. That is what courts have repeatedly done in this area. In Fort Halifax, the Supreme Court's case, the plaintiff employer's argument was, well, you're putting me in a, you're hurting my competitiveness as a result of this minimum labor standard with an opt-out. Supreme Court did not find the labor preempted. That was the argument in American Hotel in the Ninth Circuit, that you're, because you're allowing unions to contract out of this high minimum wage requirement, you're pressuring unionization. Ninth Circuit said too attenuated. Third Circuit in St. Thomas-St. John addressed this very similar argument. There, there was a for, that employees could only be dismissed for charge requirement that could be contracted out of, employers again said, but you're pressuring, you're pressuring me to unionize. Third Circuit rejected that argument as well. As the Ninth Circuit said recently in American Hotel, state employment laws that set the stage for collective bargaining are, are not preempted. It's, it's only if you're interfering in the mechanics of the, the processes that are protected by the National Labor Relations Act. Thank you, Ms. Gustafson. You've reserved three minutes for rebuttal. Thank you, Your Honor. We'll hear from Mr. Summers. May it please the Court, John Summers for the Cross Appellant and Appley Association of Car Wash Owners. Respectfully as cross appellant, may I reserve two minutes for rebuttal? It's unusual, but yes, we'll let you do that. I'd like to cover two areas. First, the district court correctly held that the machinist doctrine preempts the car wash laws to tier surety bond requirements. Second, the district court erred in its severance remedy, crafting a single tier $150,000 bond. There's no evidence from the legislative history supporting such a bond, and it's the largest licensing bond in New York City's history. Let me start with preemption. The U.S. Supreme Court's lead machinist preemption decisions compel the conclusion that a local government can't do what city council did here. The car wash law pressures employers to withhold their opposition to a union organizing campaign by requiring a non-union car wash to pay a $150,000 bond. Technically it doesn't, right? It's not non-union or union. It's got to do with whether there are these procedures in place in a collective bargaining agreement. Only a union, by definition, employer could qualify for that, but they'd have to have a particular set of remedies in place. The charge of this court is to, according to the Lovatis decision and the Brown decision, is to look at the actual content of the policy and its real effect on federal rights. That's the Brown decision, that's the Lovatis. Here, the real effect and what this policy says is if there's a collective bargaining agreement that has certain characteristics, it's a $30,000 bond. If you don't, it's $150,000. And in the context of car wash industry, it's a union versus non-union distinction. Of course, that's exactly what the Ninth Circuit confronted in cases involving other sorts of opt-outs like maximum hours laws, where the employer had certain obligations under state law, but they were lifted if the parties collectively bargained to a different regime. And as the Supreme Court has held, those are entirely different kinds of cases. There's a line of cases following metropolitan life. So just explain to me why it's different. Okay. It's different because those cases, first of all, involve minimum labor standards. This case doesn't. Facially, when you look at the statute, the ordinance covers if Your Honors are in a car accident in the car wash, then there's a fund of money for you to get. It covers environmental hazards. Suppose the city had two separate statutes. One of them says there's a $150,000 bond for covering wages, and a different one said there's a $30,000 bond to cover environmental and tort judgments. Let's just look at the $150,000 one, and that one is going to be not applicable under the circumstances that are the exceptions in this case. But the $30,000 is going to stay the same no matter what. Forget the $30,000 for a minute. Is the $150,000 with the — Gustafson calls it an opt-out. I'm not sure that's exactly the right term. Would that be constitutional? Would that be preempted? Yes. Even though that would clearly be — so the fact that there's another thing covered is really not your argument. It really is that this is not a minimum labor protection no matter what, even if there weren't tort and environmental issues factored in. Well, respectfully, it's both, but — Well, so explain to me why it would be unconstitutional because preempted in the case where you didn't have the tort and environmental argument. It would be preempted because it interferes with the employer's decision under 8C of the NLRA to determine whether to impose a unionization movement. And that's under Brown what is the protected area. It intrudes in that area by penalizing. It's not like the other traditional labor standard cases. All those cases involve things like a setting of minimum hours, severance pay. They're terms. That isn't what this is. I'm sorry. I don't understand why the mechanism of the protection makes it not a labor protection. One kind of thing says you have to pay overtime if somebody works, for example, under a spread of hours kind of provision more than eight hours in a day. But if you have a union and you can get the union to approve of a plan where the workers work three 12-hour days rather than five 7-hour days or something like that, then you get out from under the labor standard. Why doesn't that create similarly an incentive to the employer to say, oh, I can get out of paying overtime if I have a union and I can get them to agree to something? The reason is because fundamentally in the opt-out cases, Fort Halifax kinds of cases, those are instances in which there is an alternative provision that's about a thing that is the subject of negotiation. And there can be a backdrop to those negotiations, and those cases say that there can't be an intrusion on the collective bargaining process. Here, there's an intrusion on the collective bargaining process because it's all being done at the time of a unionization drive intended not to influence a term that is decided upon during a negotiation, but rather an intrusion on the collective bargaining process by an interference with whether it's unionization. Why doesn't the minimum wage one work the same way? Because if you've got a company that's not unionized and you're interested in reducing your labor costs in a certain way, and again, I don't know why in either of these cases this would all trump or coerce you when really what you're worried about is in the long run it's going to cost you more if you have a union. But put that aside. If we're hypothesizing that these different provisions can influence an employer not to oppose unionization, in each case the only way you get out from under the protective legislation is if you have a union. It's the same thing. I don't see why the minimum wage one. Yes, it does directly affect the bargaining terms, which is actually what machinist preemption directly covers. But in the context of an employer who is not at that moment unionized, it creates an incentive to have a union in the same way that this does. Let me touch briefly on it, and then I want to turn to some of the other questions that were asked on the other side and then turn to severance. Fundamentally, the cases sharply distinguish between the opt-out and the other terms of a collective bargaining agreement. And there aren't cases that look like this where there's an invasion of the collective bargaining process. There were some comments earlier about the level of— Brown, the district of Rhode Island decision that was close to your Honor's hypothetical about the tax. There's nothing attenuated about the pressure. There's nothing premature or hasty about this decision. The undisputed record in front of the city council was—and I'll give one example, which was the surety bond company owner, Jeffrey Price. He testified that the higher the bond requirement, the more cash a company's got to have on hand at the end of the year. So it's not $30,000, it's $150,000. That's a lot. He said that there's an inevitable pressure because you pay greater taxes. You've got to have a certified financial associated with it. And again, in the context of Supreme Court decisions, there's no Supreme Court decision that says you need to do an econometric analysis or a fancy study to look at pressure. In the Lovatis case, an employee lost three days' wages. And that was ample pressure, the imposition of a penalty on an employee. Here we have $120,000. In the Brown decision— Wait, wait, wait. Where is the evidence that there's a $120,000 penalty? The evidence is that in the testimony in front of city council, city council was told that a surety bond is unlike regular insurance. You need to have cash on hand, net worth, and you need to have greater net worth for the bond because you may end up having to pay. I see what you're saying. And that's where it comes from. And so there's nothing hypothetical or attenuated. It's on its face. In the Brown decision, they had the Supreme Court conclude that a statute that operated in the following way, a company like Verizon could have billions of dollars of money that it could spend to oppose a union. But California passed a law that said no money you get from us can be used to oppose a union. So if there's a billion—and that was sufficient intrusion. There is— There's also a direct statement that you can't spend money opposing a union. Well, this is direct. You've got to pay effectively for a higher bond if you have a union. So there were billions of dollars. It was of no consequence to the companies because they could have ample—they had more than ample money to go ahead and do it. But the point is that facially, when you look at it, what is being told to the employer? Here, unequivocally, the real effect is that. May I turn briefly to severability? Very. Yeah, and you can start with the severability clause in the legislation. That's right. There's a severability clause in the legislation. There is—that is in the backdrop of the question that comes from a more than 100-year-old case from Judge Cardozo as to what this court's charge is. And there's no disagreement between the city and we with respect to that. And that is the question is whether the legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part extended or rejected altogether. And here, there were repeated occasions in which city council committee contemplated a single-tier bond and concluded—never got out of committee, we don't want to have one. There were repeated bills which contained a single tier and various other things, and there are various iterations, and then you get what you get, including a severability clause. What is better evidence of what the legislature would have wanted to do if one piece of this statute falls out than a severability clause that says if a court finds something unconstitutional in here, the rest will stand? We have—there are two alternative ways this could get handled. And we have—we urge the court to sever, recognize the severability clause, and strike the bond provision. The bond provision in its entirety, and you can save the rest of the legislature. But what you're saying is preempted, is not a bond. There's nothing preempted about saying that a business, in order to be licensed, has to have a bond to cover possible claims against the business, including labor claims. What is preempted, you say, is that there is a differential which creates an incentive to unionize. Well, fair enough. Let's assume we agree with you on that. Why don't we strike the piece that creates that disincentive? That's what is preempted, not the existence of the bond. Fair inference in the legislative history, given what—given its—the multiple drafts, is that there is not a bond provision that's single-tier that would have been acceptable. I think Justice Scalia is looking down from heaven at this moment and wondering what is going to justify us in deciding what the legislature would have preferred, based on statements in the legislative history, as opposed to a statement of what the legislature preferred that it put into the statute, voted on, and everybody agreed to. And atop one cloud is Justice Scalia, and atop another cloud is Judge Cardozo. Judge Cardozo actually wrote the opinion of the New York law that this Court is charged to follow, not Justice Scalia. And Judge Cardozo says you look at what the—you do your best in looking at the legislative history to determine what would— That they did not mean what they said when they wrote a severability clause into the statute. Respectfully, no, Your Honor. There was a—our position is that respect the severability clause and strike the bond provision. The bond provision that made it out, the bond provision that was union-crafted, advocated during union drives, was two-tier. Ah, so now what we're looking at as legislative history is not just the random comments of City Council members. Now we're looking at who liked the bill and who didn't like the bill, and we're going by the intent of the lobbyists who argued for the bill, not actually the legislative intent as expressed in the statute that they passed. Your Honor, you heard the city lawyer say they looked to California for the experience. The California experience was to get—was a two-tier bond, admittedly different, $150,000 and zero, to drive unions. And that's what this bond did. And that's what—and they looked to California for that experience. Your Honor, if you struck the bond provision— To the contrary. The undisputed affidavit before the district court in front of Judge Hellerstein from the other Cardozo, Michael Cardozo, laid out the experience in California of—and its impact of the bond. And it was a significant experience. There was a decline in the number of licensed car washes after the enact of this bond. So— That shows it's a really bad law, and we should second-guess that. What does that show about unionization activity? Did car washes suddenly all turn to unionizing under the two-tier bond in California? Is there evidence of that? I believe there was evidence that there was an increase in unionization. And, in fact, the testimony before the city council, there was a committee report on an initial version at A-275, a committee report on an enacted version at A-817 that said and reported on the California experience, highlighting the increased number of union members that are covered because of a law like this one. So, yeah, that was exactly what the California experience showed. And your primary position—you've been advocating here your fallback position— your primary position is the whole legislation should be stricken because of this, right? I respectfully disagree with prioritization. There was an initial— Are you asking us or are you not asking us, as relief, to strike down the entire rule? Are you withdrawing that request? I'm saying there are two alternatives that Your Honors could do. And one alternative is to strike the bond provision. Another alternative is to strike the bill. Judge Hellerstein— But there's no alternative to just strike the $30,000 reduction. No, that's not—that is so flatly inconsistent with the legislative history. I couldn't ask Your Honors to do that. That would be inconsistent with Judge Cardozo's direction. That's inconsistent with the legislative history. As Judge Hellerstein did, he initially struck the whole bill, and then he, on motions to reconsider, struck just that one portion of the bond provision, which we have timely appealed from. Thank you. Thank you. Mr. Summers, and you've reserved some time for rebutting whatever Ms. Gustafson says in response to your appeal. And if she doesn't say anything in response to your appeal, you may remain seated. I do intend to. Thank you, Your Honor. I am happy to address any questions from the Court on any of those issues, but I'd like to start with the costs, move through the California issue, talk about the three cases that plaintiffs were relying on in argument, Brown-Levatas and Rhode Island, and at the very end address severability. The costs issue, where the idea that there's substantial uncertainty about additional costs, like certified financial statements or what a bond requirement would actually, or what a bond, sure, would actually require, comes from plaintiff's own affidavit at page 138 and 139 of the record, submitted in support of summary judgment. Plaintiffs are ignoring that affidavit in favor of the testimony that was given on the $300,000 bond. But as we have already addressed, even if we assume that what the original testimony on the $300,000 bond, which is not what was ultimately enacted, the costs that were given, again, were modest, and nonetheless it's implausible that this law would have the effect that plaintiffs claim. But in any event, those costs don't matter as a matter of law. Secondly, on California, every committee report addressing all of the various versions of this law included some statement about unionization in California, including the versions of the law that didn't have any exceptions to the bond requirement. I mean, there's no inference that can be drawn from the existence of a similar statement in every single committee, in every committee report, that the intent of this final law was to favor unionization. In any event, this Court looks at the plain terms and effect of the law. And about California's experience, what the experience and the evidence in the record shows is that 99 percent of the registered car washes in California are not using a CBA to satisfy the bond requirement, which directly rebuts plaintiff's theory. It does not support it. On Brown, as Your Honor, Judge Legis mentioned, that was a direct regulation of non-coercive employer speech. Brown itself was a unique case, as the Supreme Court said. Plaintiffs are over-reading Brown to a point where it would conflict with metropolitan life and with Fort Halifax. Plaintiffs read Brown to say any time you change the incentives of an employer to speak, you are preempted. But, again, those were the arguments that were rejected in metropolitan life, Fort Halifax, and their progeny. Levatas is a fundamentally different type of case. It's not even clear that was decided on machinist grounds. Levatas instead looked at Nash, an earlier decision of the Court, and focused on the issue of whether there was a penalty for the exercise of federal rights. And in that case, the Court was concerned that merely by the act of citing a collective bargaining agreement containing an arbitration clause, the employee was losing the protection of the law, whether or not that arbitration clause covered the protection. That is entirely unlike this law. What I would term an opt-out is targeted to the same goals as the underlying provision. But even if plaintiffs could maintain that this case does not meet a narrow definition of minimum labor standard or opt-out, they've never explained why that is legally significant. The same reasoning that underlies all of those laws shows why this law is not preempted. Finally, on severability. You really want to have a hurried two sentences on severability so as to give your adversary at least two minutes to talk about that topic? Is that what you're going to do now? I'm sure she's not going to do that. I am so sure. There is no way that I am going to do that. I'm going to take the hint. I will therefore instead end on the only other case cited by plaintiffs, which was the case out of Rhode Island which involved the tax incentive. It's an entirely different set of circumstances. There's extensive case law in the area of background employment regulation by the states pursuant to their police powers. And those background laws have not been found preempted as having too attenuated an effect on the self-organization and collective bargaining process. This law was properly enacted by the city council pursuant to its police powers. It serves important interests. It protects vulnerable low-raised workers. It seeks to protect the environment in the city, and it seeks to protect consumers. It should be reinstated in its entirety. Thank you, Your Honors. Thank you both. Well-reserved decision, well-argued, and nice to see you, Mr. Cordoza. Did you hire her? Oh, all right. Okay. Anyway, everyone have a good day. I'll ask the clerk please to adjourn. It's good to know they're still doing a good hiring job. Thank you.